# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 20, 2004 Session

## STATE OF TENNESSEE v. MARIO HERNANDEZ CASTILLO

**Direct Appeal from the Circuit Court for Grainger County**
No. 3621     O. Duane Slone, Judge

---

### No. E2003-01250-CCA-R3-CD
### May 21, 2004

---

A Grainger County jury convicted the defendant of premeditated first degree murder, felony murder, especially aggravated robbery, and theft under $500. The trial court merged the felony murder conviction into the premeditated first degree murder conviction and ordered the defendant to serve an effective life sentence. The defendant raises the following issues on appeal: (1) whether the trial court erred in failing to suppress his statement to law enforcement officials; (2) whether the trial court erred in failing to allow the defense to introduce proof that the victim regularly dealt in illegal drugs and firearms; and (3) whether the evidence was sufficient to sustain his murder convictions. We remand for entry of an order merging the theft conviction into the especially aggravated robbery conviction but otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court
Affirmed as Modified**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

Edward C. Miller, District Public Defender, for the appellant, Mario Hernandez Castillo.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; and Al C. Schmutzer, Jr., District Attorney General, for the appellee, State of Tennessee.

### OPINION

Special Agent Carl Smith of the Tennessee Bureau of Investigation testified he was the head of the law enforcement team formed to investigate the January 2000 shooting deaths of two individuals, including the victim in this case, Jackie Petitt. The shooting took place at the victim's residence in Grainger County. Agent Smith testified the body of a young Hispanic man found outside the victim's residence was determined to be Leoncio Cantu. Agent Smith found the body of the victim just inside the dining area of the victim's residence. No weapons were found on the victim. Agent Smith found bullets which had been fired from a .30 caliber gun, as well as ejected and unfired shells from the same caliber weapon. This weapon was not found at the scene. The

victim's vehicle was discovered at the end of the driveway. The victim's wallet, which contained $8.00 and was stained with the defendant's blood, was found inside the vehicle.

Agent Smith stated a nine millimeter handgun subsequently found at the scene had fired, but not ejected, the spent shell casing found in its chamber. Agent Smith further explained that Cantu was determined to have died as a result of a .22 caliber bullet wound to the chest.

Shelby Barnard, the victim's daughter, identified the victim's wallet and testified the victim always carried at least $500 in currency.

Dr. Cleland Blake, a forensic pathologist, performed the autopsies on both the victim and Cantu. Dr. Blake stated Cantu died as a result of a .22 caliber gunshot wound to the chest. As to the victim, Dr. Blake enumerated numerous blunt injuries to the victim's scalp and head, including one blow which indented the victim's skull. He testified such a beating would result in "concussional injury to the brain [until the victim] would be staggering or certainly not themselves and not be acting normal." Dr. Blake stated the victim received gunshot wounds to the chest and head, both from an intermediate caliber weapon. Dr. Blake testified the wound to the victim's chest would have been lethal, but the second gunshot wound entered the back of the head and caused immediate death.

Special Agent Chad Smith of the Tennessee Bureau of Investigation testified the defendant's fingerprints and photograph were placed on the internet at the time of his inclusion in the TBI's "Top Ten Fugitive List." He testified the defendant's fingerprints were enrolled in law enforcement databases and stated he received a phone call in September 2001 from the United States Border Patrol near Las Cruces, New Mexico. He was able to provide the Border Patrol with fingerprint information, thus enabling the Border Patrol to identify a subject being detained by that agency as the defendant. Agent Chad Smith testified Cantu was shot with a .22 caliber weapon. He further described his awareness of various security devices present at the victim's residence, including a video surveillance system and an alarm device that would page the victim when someone entered the property. He testified the victim owned a pager and a cell phone, and people who deal in drugs conduct their business with cell phones and/or pagers. He further stated drug dealing was known to be a dangerous activity.

Agent Andrew Wylie of the United States Border Patrol testified regarding the defendant's attempt to enter the United States illegally in September 2001, the Border Patrol's apprehension of the defendant, and the steps the Border Patrol took in an effort to identify him. Agent Wylie testified that after discovering the defendant's identity and his being wanted in Tennessee, the Border Patrol turned him over to the New Mexico State Police.

Officer Felipe Gonzalez of the New Mexico State Police testified he informed the defendant in Spanish of his constitutional rights under *Miranda*, both orally and in writing. Officer Gonzalez testified the defendant indicated he wished to cooperate and was willing to talk. Officer Gonzalez testified the defendant said he was picked up by a friend [Cantu], who indicated they were going to go to a residence "to meet with someone regarding a business deal." The defendant and Cantu left Cantu's van at the defendant's residence and drove the defendant's van to Cantu's father's house, where Cantu retrieved a rifle.

Officer Gonzalez testified the defendant said he and Cantu then drove to the victim's residence. The defendant, Cantu and the victim went inside the victim's residence, where they discussed "pounds, meaning marijuana, cocaine." Officer Gonzalez testified the defendant said he did not know what was going on and stepped out of the residence; he then heard two or three shots. Officer Gonzalez testified the defendant said Cantu came out of the door grasping his chest, telling the defendant he had been shot. Cantu fell to the ground just outside of the door.

Officer Gonzalez testified the defendant said he became "really upset and angry" and proceeded to go inside and "make contact" with the victim. Officer Gonzalez testified the defendant said a fight ensued and the victim had a gun. Officer Gonzalez testified the defendant said he and the victim eventually fell on top of a bed, and the victim's gun discharged, striking the defendant in the torso. Officer Gonzalez testified the defendant said he was able to take the weapon from the victim and beat him with it. The defendant and the victim continued to fight. The defendant said he realized that the weapon he had taken away from the victim did not have any more ammunition; therefore, he retreated from the bedroom area and went outside. Officer Gonzalez testified the defendant said he thought the victim was trying to get another weapon.

Officer Gonzalez testified the defendant said that when he went outside, he noticed Cantu was dead. He then took the rifle from underneath Cantu's arm. Officer Gonzalez testified the defendant said he also removed a magazine of ammunition from Cantu's pants. Officer Gonzalez testified the defendant said he waited outside by the door until he saw the victim come out of the bedroom area with a gun, and then the defendant took three shots which struck the victim "somewhere around the mid-section area." Officer Gonzalez testified he asked the defendant approximately three times whether the victim had a gun at the time the defendant shot him, and he responded affirmatively each time.

Officer Gonzalez testified the defendant said he took the rifle as well as the handgun which the defendant had wrestled from the victim, drove the victim's vehicle to where his own vehicle was parked, and drove away from the scene. Officer Gonzalez testified the defendant said he called Cantu's father to tell him that his son had been shot and killed, drove to Atlanta where he treated himself for his wounds, and proceeded to Houston, Texas, where he disposed of the weapons.

Officer Jesse Jarnigan of the Rutledge Police Department testified the victim had a tone-sounding device which emitted a tone when a vehicle penetrated the perimeter of the residence. Officer Jarnigan described the video surveillance system found within the victim's residence and narrated the videotape, which captured the shooting of the victim in the back of the head after he had been previously shot and while he was walking away from the defendant. The videotape was played for the jury.

The victim's home and grounds were monitored by three cameras. As stated, the victim's murder was captured on videotape. Only one of the cameras recorded the living room of his home where the killing took place; therefore, the resulting video archive is sporadic. The videotape reveals the following sequence of events.

The first image is of the victim, walking alone across his living room, carrying a large handgun. The second scene shows the victim, apparently unarmed, standing in his living room with

the defendant and another man. The second man, Cantu, appears to be hiding a rifle under his long shirt. The third scene shows Cantu retreating across the living room toward the back door of the residence, carrying the rifle and holding his stomach. The fourth scene shows the victim, who appears to have been beaten, staggering in front of the defendant. The defendant gestures with a gun in one hand, while jabbing the victim in the chest with his other. The final scenes show the defendant stride toward the door and pick up the rifle which Cantu carried earlier. The staggering victim follows him. The defendant appears to be trying to chamber a shell into the rifle. Then the victim staggers against the wall, apparently having been shot in the chest. The victim then walks away from the defendant, and the defendant raises the rifle and fires it into the back of the victim's head. The victim immediately collapses. The next scene shows the defendant rummaging through the victim's pants pockets, remove an item, and place the item in his own pocket.

Officer Jarnigan testified the videotape did not support the defendant's statement that he went outside and was standing outside when Cantu was shot. Officer Jarnigan further testified the videotape did not support the defendant's statement that when he shot the victim, the victim was coming toward the defendant holding a pistol.

Denise Bailey testified she previously dated the victim. Bailey stated she lived with the victim for a total of three years. Bailey testified the victim "peddled" in marijuana "occasionally."

## I. SUPPRESSION OF THE DEFENDANT'S STATEMENTS

The defendant contends statements he made to the New Mexico State Police should have been excluded from the evidence at trial. Specifically, he contends these statements were the "fruit" of his *Miranda*-poor statements to the Border Patrol which indicated he had gunshot scars and was wanted in Tennessee. We conclude the defendant is not entitled to relief on this issue.

### A. The Suppression Hearing

At the suppression hearing, Agent Wylie of the United States Border Patrol testified the defendant was initially apprehended by agents of the Border Patrol in New Mexico at approximately 2:00 a.m. on September 26, 2001, after attempting to enter the United States illegally. Agent Wylie stated the defendant identified himself as "Ruben Asuara-Trejo."

Agent Wylie stated the defendant was taken within minutes to the Border Patrol Station in Las Cruces for processing. Agents took the defendant's fingerprints and ran them through law enforcement databases, which alerted the agents to do further research into the subject's identity by calling a telephone number. Agent Wylie testified the agents knew only that the subject they were attempting to identify was a possible wanted person, and Agent Wylie's supervisor "had had [a] conversation with somebody somewhere else" regarding scars or other physical features unique to the fugitive.

Agent Wylie testified he did not advise the defendant of his *Miranda* rights. Agent Wylie testified the agents asked the defendant if he had any scars. Agent Wylie stated that at the time he asked the defendant the questions about identifying physical characteristics, "we had no idea it was

a murder. . . ."[1] Agent Wylie testified it was 5:55 a.m. before the Border Patrol learned that the defendant was wanted in Tennessee for murder. The defendant was transported to the New Mexico State Police.

Officer Felipe Gonzalez, an officer with the New Mexico State Police, testified at the suppression hearing that he interrogated the defendant at the New Mexico State Police station. The interview was conducted in Spanish, the defendant's native language. Officer Gonzalez testified he informed the defendant of his constitutional rights, also in Spanish, prior to questioning him. Officer Gonzalez stated he read the defendant his rights and gave the defendant an opportunity to read the rights himself. Officer Gonzalez testified the defendant asked questions concerning his rights, which were answered. The defendant acknowledged that he understood his rights and wished to speak with the New Mexico State Police. Officer Gonzalez identified a Spanish-language "Advice of Rights" form signed by the defendant. Officer Gonzalez' interview of the defendant, conducted in Spanish, began at approximately 9:00 a.m. and lasted approximately one to two hours.

## B. Trial Court's Findings

The trial court found the defendant was lawfully detained by the Border Patrol while they investigated whether or not he was lawfully in the United States. The court found the defendant was fully apprised of his rights under *Miranda* by the New Mexico State Police prior to giving his statement to Officer Gonzales; the defendant questioned those rights and received answers; and he voluntarily chose to waive his constitutional rights. The court held that any statements made by the defendant after he was advised of his rights would be admissible into evidence. The court further held that any statements made by the defendant to the Border Patrol regarding his scars would also be admissible.

## C. Standard of Review

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. State v. Saylor, 117 S.W.3d 239, 244 (Tenn. 2003). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). However, this court is not bound by the trial court's conclusions of law. State v. Randolph, 74 S.W.3d 330, 333 (Tenn. 2002). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

---

[1]There was no testimony at the suppression hearing about the defendant's response to Agent Wylie's inquiry. However, his trial testimony indicated the defendant stated he had a gunshot scar and was wanted in Tennessee.

**D. Analysis**

The defendant correctly asserts that "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). If the initial confession is illegally obtained, even a later *Mirandized* confession may, under certain circumstances, be tainted by the initial confession; thus, the subsequent confession would be inadmissible. State v. Smith, 834 S.W.2d 915, 921 (Tenn. 1992).

*Miranda* warnings are not necessary prior to asking routine booking questions, and they are not necessary when a suspect merely displays a physical characteristic. *See* Pennsylvania v. Muniz, 496 U.S. 582, 592, 110 S. Ct. 2638, 110 L. Ed. 2d 528 (1990); State v. Walton, 41 S.W.3d 75, 84 (Tenn. 2001). The United States Supreme Court has held that "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

The record indicates the Border Patrol's questions were intended merely to *identify* the defendant. The Border Patrol had no reason to suspect that the routine booking questions they posed in an effort to identify the defendant would lead to any incriminating response. The defendant's response that he had a gunshot scar and was wanted in Tennessee reveals nothing in regard to the events surrounding the shooting.

Moreover, even if we assume the defendant's responses to the Border Patrol that he had gunshot scars and was wanted in Tennessee were in violation of *Miranda*, we conclude his subsequent, voluntary confession to Officer Gonzalez of the New Mexico State Police was admissible. Our supreme court held that, pursuant to the Tennessee Constitution,

> extraction of an illegal, unwarned confession from a defendant raises a *rebuttable* presumption that a subsequent confession, even if preceded by proper *Miranda* warnings, is tainted by the initial illegality. That presumption may be overcome by the prosecution, however, if the State can establish "that the taint is so attenuated as to justify admission of the subsequent confession."

834 S.W.2d at 919 (emphasis added) (citations omitted). Our inquiry in such situations is,

> whether the events and circumstances surrounding and following the initial, illegal conduct of the law enforcement officers prevented the accused from subsequently (1) making a free and informed choice to waive the State constitutional right to provide evidence against one's self, and (2) voluntarily confessing his involvement in the crime.

*Id*. In making this determination, we must consider the following factors:

-6-

1. The use of coercive tactics to obtain the initial, illegal confession and the causal connection between the illegal conduct and the challenged, subsequent confession;

2. The temporal proximity of the prior and subsequent confession;

3. The reading and explanation of *Miranda* rights to the defendant before the subsequent confession;

4. The circumstances occurring after the arrest and continuing up until the making of the subsequent confession including, but not limited to, the length of the detention and the deprivation of food, rest, and bathroom facilities;

5. The coerciveness of the atmosphere in which any questioning took place including, but not limited to, the place where the questioning occurred, the identity of the interrogators, the form of the questions, and the repeated or prolonged nature of the questioning;

6. The presence of intervening factors including, but not limited to, consultations with counsel or family members, or the opportunity to consult with counsel, if desired;

7. The psychological effect of having already confessed, and whether the defendant was advised that the prior confession may not be admissible at trial;

8. Whether the defendant initiated the conversation that led to the subsequent confession; and

9. The defendant's sobriety, education, intelligence level, and experience with the law, as such factors relate to the defendant's ability to understand the administered *Miranda* rights.

*Id*. at 919-20.

We discern no evidence in the record that the defendant was subjected to coercive tactics by the Border Patrol when he was asked whether he had any identifying scars and whether he was wanted in Tennessee. There appears to be no causal connection between the defendant's response to the Border Patrol and the defendant's subsequent statement to the New Mexico State Police. The defendant was being transferred to the New Mexico State Police in any event, even had he not identified himself truthfully; his transfer to the state authorities was the result of the "hit" his fingerprints elicited, not any statements he made to the Border Patrol. We conclude that the time lapse between the initial questioning by the Border Patrol and the defendant's subsequent confession to the New Mexico State Police does not favor suppression. Furthermore, the record indicates the defendant was apprised of his constitutional rights under *Miranda*, both orally and in writing, in his native language. The defendant waived his rights. There is no evidence which would suggest that the defendant was detained an unreasonable time; there is no indication that he was deprived of food, rest or bathroom facilities; and there is no indication of any coerciveness.

Additionally, it is clear that multiple intervening factors were present between the defendant's initial statements to the Border Patrol and his subsequent statement to the New Mexico State Police, including: a lapse in time of three hours, a change in location, a change in the manner of his

detention, and a change in the actual person(s) and government agency doing the questioning. Also, as noted earlier, he was apprised of his rights and given the opportunity to request counsel or decline to answer questions altogether. We can discern no psychological effect of having previously made his brief identifying response to the Border Patrol. Although it appears the defendant did not initiate the conversation which led to his ultimate confession, there is no evidence in the record that the defendant lacked the intelligence or experience with the law to make an informed decision to waive his constitutional rights.

In short, our examination of the totality of the circumstances surrounding the defendant's initial questioning by the Border Patrol, his arrest and detention, and his subsequent statement to the New Mexico State Police leads us to the inescapable conclusion that he knowingly and voluntarily waived his right against self-incrimination prior to making his statement. The prosecution successfully rebutted any possible presumption that the defendant's subsequent statement was tainted by the brief questioning by the Border Patrol. This issue is without merit.

## II.  EXCLUSION OF EVIDENCE

The defendant contends the trial court erred in excluding testimony that the victim kept a large cache of weapons at his residence and that the victim regularly dealt in drugs and weapons, in support of the theory that the victim was the first aggressor. *See* State v. Ruane, 912 S.W.2d 766, 779 (Tenn. Crim. App. 1995); Tenn. R. Evid. 404(a)(2). We respectfully disagree.

In a jury-out hearing, the defendant proffered the testimony of Officer Dan Cox. He testified he was employed in the Narcotics and Vice Division of the City of Morristown, Tennessee. Officer Cox stated he performed an investigation into the illegal activities of the victim based upon information provided by informants. Officer Cox testified he also purchased weapons from the victim and kept a file on the victim's alleged dealings in cocaine and/or marijuana. Officer Cox testified he executed a search warrant at the victim's residence near the time of the victim's death, at which time he discovered "some 50 plus firearms," most of which were in a safe. Officer Cox stated that persons who deal in drugs and weapons ordinarily carry large amounts of cash on them, and that dealing in drugs and firearms is a dangerous activity.

The defendant argued to the trial court that all of this testimony was relevant to show the victim was the "first aggressor," thus making it relevant to the defendant's self-defense claim. The trial court ruled that "certain evidence of drug dealing activity on the part of the alleged victim should be admitted into this case." The trial court, however, declined to allow the defense to ask Officer Cox about information received from informants, but did authorize Officer Cox to testify regarding statements made directly to him by the victim. The trial court further ruled that evidence of weapons that the victim kept outside of the locked safe would be admissible, while evidence of weapons the victim kept locked in the safe would not be. After the trial court's ruling, the defense elected not to call Officer Cox as a witness before the jury.

We conclude the defendant is not entitled to relief on this issue. The trial court authorized evidence concerning the victim's drug activities. Agent Chad Smith testified about the victim's surveillance system and possession of a pager and cell phone, which are customarily used in the drug trade. He further stated drug dealing was a dangerous activity. The defendant's statement

made reference to a discussion with the victim of "pounds, meaning marijuana, cocaine." Further, Denise Bailey, the victim's former girlfriend, testified the victim "peddled" marijuana. The statements made by informants to Officer Cox about the victim's alleged drug dealing would be hearsay. *See* Tenn. R. Evid. 802. To the extent Officer Cox's testimony might arguably be admissible as reputation or opinion evidence under Tennessee Rule of Evidence 405, the trial court did not err in concluding the probative value of such testimony was outweighed by its prejudicial effect and confusion of the issues. *See* Tenn. R. Evid. 403, 405(a)(3).

The trial court authorized testimony concerning the weapons found at the victim's residence outside the locked box. We conclude the trial court did not err in excluding testimony about weapons in the locked box. They have no real relevance to the defendant's claim of self-defense under the facts and circumstances of this case. *See* State v. Steven Tolbert, No. 03C01-9707-CR-00325, 1998 Tenn. Crim. App. LEXIS 1038, at *15 (Tenn. Crim. App. Oct. 2, 1998) (noting the victim's prior sales of weapons was not directly relevant as to the probability of his use of a deadly weapon at the time of the offense), *perm. to app. denied* (Tenn. 1999). Although the trial court authorized the officer's testimony about other weapons, the defendant elected not to call the officer to testify. This issue is without merit.

## III. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to sustain his convictions for premeditated first degree murder and felony murder. The defendant specifically argues that (1) the prosecution failed to prove beyond a reasonable doubt that he did not act in self-defense; (2) the prosecution failed to establish premeditation; and (3) the prosecution failed to establish that he intended to commit a felony at the time of the murder. The state contends the evidence was sufficient to support the convictions. We agree with the state.

### A. Standard of Review

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003). Nor may this court reweigh or re-evaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

### B. Self-defense

The defendant asserts that, having raised the theory of self-defense, the prosecution failed to successfully negate that defense beyond a reasonable doubt. We disagree.

-9-

Self-defense is defined in Tennessee Code Annotated section 39-11-611(a), as follows:

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Self-defense is unavailable where the initial aggressor has ceased the attack and the defendant is no longer endangered. State v. Reynolds, 666 S.W.2d 476, 478 (Tenn. Crim. App. 1984). When self-defense is fairly raised by the evidence, the state has the burden of negating the defense beyond a reasonable doubt. Tenn. Code Ann. § 39-11-201(a)(3); State v. Belser, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996). However, it is ultimately for the jury to determine whether the defendant acted in self-defense. State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997).

The videotape clearly depicts the defendant was in no danger from the victim when the defendant shot the beaten, unarmed, staggering victim in the back of the head while the victim was walking away from him. A reasonable juror could have found that the state negated the defendant's claims of self-defense beyond a reasonable doubt. This issue is without merit.

## C. Premeditated First Degree Murder

The defendant contends that the evidence is insufficient to support a verdict of premeditated first degree murder. The applicable definition of first degree murder is "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation necessitates "a previously formed design or intent to kill," State v. West, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [meaning] that the intent to kill must have been formed prior to the act itself." Tenn. Code Ann. § 39-13-202(d). It also requires that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court delineated several circumstances that may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000).

In Tennessee, when a homicide has been established at trial, it is presumed to be second degree murder, and the burden is on the state to prove the element of premeditation sufficient to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999); State v. Long, 45 S.W.3d 611, 620-21 (Tenn. Crim. App. 2000).

We conclude the state has overcome the presumption of second degree murder. The record indicates the defendant used a deadly weapon on a beaten, unarmed, defenseless, wounded victim. The defendant walked away from the victim to retrieve the weapon used to inflict the fatal injury, indicating a cool purpose and intent to kill formed prior to the act itself. The victim, at the time he was shot in the back of the head, was staggering and walking away from the defendant. Viewing the evidence in the light most favorable to the state, as we must, we conclude the evidence was sufficient to support premeditated first degree murder.

## D. Felony Murder

The defendant contends the evidence is insufficient to establish felony murder because the state failed to prove beyond a reasonable doubt that he intended to commit a felony at the time he killed the victim. Specifically, he contends the homicide was merely collateral to the robbery/theft. Because we affirm the conviction for premeditated first degree murder and the felony murder conviction was merged, the defendant will stand convicted of first degree murder regardless of our analysis of felony murder. Nevertheless, we address this issue in the event of further appellate review.

The defendant contends that the evidence fails to establish that he intended to rob the victim prior to killing him; he maintains, instead, the robbery was merely an afterthought. The defendant correctly asserts that "the intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." State v. Buggs, 995 S.W.2d 102, 107 (Tenn. 1999). The killing may precede, coincide with, or follow the felony and still be in the perpetration of the felony, so long as there is a connection in time, place and continuity of action. State v. Madden, 99 S.W.3d 127, 135 (Tenn. Crim. App. 2002) (citing Buggs, 995 S.W.2d at 106). Proof of the intention to commit the underlying felony and at what point it existed are questions for the jury after consideration of all the facts and circumstances. Buggs, 995 S.W.2d at 107.

The evidence reflects the defendant entered the victim's residence knowing his friend Cantu was armed with a rifle. It is undisputed that the defendant killed the victim and took property from him after he was dead. The videotape of the killing shows the defendant shoot the victim, immediately search the victim's pockets, remove property from the victim, and place the property in his own pocket. The testimony at trial from the victim's daughter indicated the victim never carried less than $500 in cash. The victim's wallet contained only $8.00. Viewing the evidence in a light most favorable to the state, a reasonable jury could have found the killing was sufficiently connected to the robbery/theft since there clearly was a connection in time, place and continuity of action. This issue lacks merit.

-11-

**E. Merger of Theft with Especially Aggravated Robbery**

Although not raised by the parties on appeal, we note the defendant's dual convictions for especially aggravated robbery and theft under $500 are improper. Theft is a lesser-included offense of especially aggravated robbery. *See* State v. Bowles, 52 S.W.3d 69, 79 (Tenn. 2001) (holding theft is a lesser-included offense of robbery). Dual convictions for these offenses violate double jeopardy. *See* State v. Denton, 938 S.W.2d 373, 382 (Tenn. 1996). The proper remedy is to merge the convictions. Although it has no effect upon the effective sentence, we remand for entry of an order merging the theft conviction into the especially aggravated robbery conviction.

## CONCLUSION

After a careful review of the record and relevant authority, we remand for entry of an order merging the theft conviction into the conviction for especially aggravated robbery. Otherwise, we affirm the judgments of the trial court.

_____
JOE G. RILEY, JUDGE